No. _____

IN THE COURT OF CRIMINAL APPEALS OF TEXAS

Matthew Lee Barnett, Petitioner

v.

The State of Texas

No. 02-13-00609-CR
IN THE COURT OF APPEALS
SECOND DISTRICT OF TEXAS
Fort Worth, Texas

No. CR12446 in the 355th District Court
Hood County, Texas
The Honorable Ralph H. Walton, District Judge, Presiding

_____

**PETITION FOR DISCRETIONARY REVIEW**
_____

FILED IN
COURT OF CRIMINAL APPEALS

July 1, 2015

ABEL ACOSTA, CLERK

Mark B. Dewitt
Attorney for Petitioner
POB 1274
Granbury, Texas 76048
817-573-1181; Fax 817-573-5110
magby137@yahoo.com
SBN 05669500

## TABLE OF CONTENTS

**Page**

Names of all Parties.................................................................................1

Index of Authorities ...............................................................................2

Oral Argument........................................................................................3

Statement of the Case.............................................................................4

Statement of Procedural History .............................................................5

Grounds for Review ...............................................................................6

1. The justices of the court of appeals disagreed on material questions of law necessary to the court's decision.

2. The court of appeals decision conflicts with another court of appeals' decision on the same issue.

3. The court of appeals had decided an important question of state or federal law in a way that conflicts with applicable decisions of the Supreme Court of the United States.

Argument...............................................................................................6

Prayer for Relief....................................................................................9

Certificate of Service............................................................................10

Appendix ..............................................................................................11

# NAMES OF ALL PARTIES

HON. RALPH H. WALTON, Jr.
District Judge
355th Judicial District
Hood County Justice Center
Granbury, Texas 76048

ROBERT CHRISTIAN
District Attorney
Hood County Justice Center
Granbury, Texas 76048

MARK B. DEWITT
P.O. BOX 1274
Granbury, Texas 76048
Counsel for Petitioner(Appeal)

MEGAN CHALIFOUX
Assistant District Attorney
Hood County Justice Center
Granbury, Texas 76048

MATTHEW LEE BARNETT,
Petitioner, TDCJ # 01902805
c/o Gurney Unit
1385 FM 3328
Palestine, Texas 75803

# INDEX OF AUTHORITIES

**Cases:** **Page**

<u>Rhoades v. State,</u> 84 S.W.3d 10 (Tex. App.—Texarkana 2002, no pet.)..................8

<u>Rodriguez v. U.S.,</u> 575 U.S. _____ , Court No. 13-9972 (2015)..........................9

<u>Swain v. State,</u> 181 S.W.3d 359 (Tex. Crim. App. 2005)...........................................7

<u>Wade v. State,</u> 422 S.W.3d 661 (Tex. Crim. App. 2013)...........................................8

**Statutes:**

Texas Health & Safety Code §481.112 ...........................................................................5

Texas Health & Safety Code §481.115 ...........................................................................5

**Constitutions:**

U.S. Const. amend. IV ...................................................................................................10

## ORAL ARGUMENT

Petitioner is not requesting oral argument before the court.

## STATEMENT OF THE CASE

Police, acting on information from an investigator, made a pretext stop of Petitioner's vehicle. The patrol officer that stopped Petitioner almost immediately asked for permission to search Petitioner's vehicle. Petitioner refused. Petitioner's driver's license and insurance information were held by the officer, as other officers also pulled up to the scene. Petitioner continued to be questioned and finally relented to the search after rounds of questioning from the officers. Upon searching Petitioner's car officers found a small amount of controlled substance and paraphernalia, not in plain view. A search of Petitioner's phone and comments made after his arrest were used additionally to convict Petitioner.

Two of the three-judge panel of the Second Court of Appeals wrote an opinion which stated that, despite filing a motion to suppress and having a hearing on that issue, Petitioner had not preserved error to complain about the failure to suppress the evidence obtained at the search scene and afterward. The same two judges stated that, even if Petitioner had preserved error, he had consented to the search of his vehicle and therefore the evidence, the fruit of the search, was properly admitted against him.

The dissenting judge on the three-judge panel wrote a separate opinion. The dissenting judge stated that she would find that the suppression error had been preserved. The dissenting judge also stated that she would hold that the warrantless

detention of Petitioner was not justified. The justice further stated that, if the officers' ground which justified Petitioner's seizure—that he was a party to an earlier methamphetamine sale—a warrant should have been issued for his arrest, prior to the patrol stop.

## STATEMENT OF PROCEDURAL HISTORY

Petitioner, Matthew Lee Barnett, was indicted by the Grand Jury of Hood County, Texas on two counts: (1) Delivery of Controlled Substance Equal to or Over 4 Grams But Under 200 Grams (Count 1), a first-degree felony, Tex. Health & Safety Code §481.112; and, (2) Possession of a Controlled Substance Under One Gram (Count 2), a state jail felony, Tex. Health & Safety Code §481.115 These offenses were alleged to have occurred on September 8, 2012 in Hood County, Texas. A hearing on a Motion to Suppress Evidence in the case was held on or after June 11, 2013; the trial court denied the motion to suppress.

Petitioner pled not guilty and was tried to a jury. Petitioner was convicted on both counts on November 21, 2013. The jury assessed punishment at 40 years in the Texas Department of Criminal Justice and no fine on Count 1 and the jury gave Petitioner two years in the Texas Department of Criminal Justice and no fine on Count 2.

Petitioner and the State submitted briefs to the Second Court of Appeals in Fort

Worth without oral arguments.  The Second Court of Appeals affirmed the trial court judgment in an opinion dated June 18, 2015, and marked it for publishing.  No motion for rehearing was filed.  The Petitioner is presently in custody.

## GROUNDS FOR REVIEW

1. The justices of the court of appeals disagreed on material questions of law necessary to the court's decision.

2. The court of appeals decision conflicts with another court of appeals' decision on the same issue.

3. The court of appeals had decided an important question of state or federal law in a way that conflicts with applicable decisions of the Supreme Court of the United States.

## ARGUMENT

1.

On the issue that Petitioner had not preserved error to complain about the failure to suppress the evidence obtained at the search scene and afterward, the majority cites the <u>Swain</u> case as controlling.  The majority opinion concludes with the following:  "Thus, there is authority **to suggest** that Barnett has not preserved his point for our review. See <u>Swain v. State,</u> 181 S.W.3d 359, 365 (Tex. Crim. App. 2005), cert. denied, 549 U.S. 861 (2006)" (p7, memo opinion)  The dissenting

opinion held that <u>Swain</u> did not apply in this case, because, unlike in <u>Swain,</u> the trial judge in this case was put on notice of Petitioner's complaint about the search and the evidence obtained from that search and thereafter.

On the issue that the warrantless stop and search of Petitioner was allowable and necessary, because he was a party to the methamphetamine sale that occurred nine hours earlier, the dissenting judge asked, "Why was there not a warrant for Petitioner's arrest?" The dissenting opinion points out that the meeting for the methamphetamine sale was at 2:30 p.m. The initial negotiations to meet for the drug transaction with Petitioner were at 2:52 p.m. Petitioner allegedly made further contact and suggested a meeting at 10:00 p.m. Investigator Miller requested that a patrol officer stop Petitioner in his car at 11:15 p.m. There was no exception that justified suspending the warrant requirement. The trial court did not find that the officer viewed a traffic violation; the purpose for stopping the Petitioner was to search and arrest him.

In the more than five hours that the police waited for Petitioner, they made no effort to secure a warrant. <u>Wade v. State,</u> 422 S.W.3d 661, 667 (Tex. Crim. App. 2013) ("[A]rrests, the most intrusive of Fourth Amendment seizures, . . . are reasonable only if supported by probable cause."). A warrantless arrest must be founded on probable cause plus a recognized exception to the warrant requirement. <u>Rhoades v. State,</u> 84 S.W.3d 10, 15 n.2 (Tex. App.—Texarkana 2002, no pet.) The dissenting opinion

points out, "There was no exigency that prevented officers from seeking a warrant during the five hours they did not act. There is no evidence in the record that Petitioner was in possession of evidence of the drug transaction that he would destroy as soon as the timer hit five hours. There is no evidence that he would flee when the timer hit five hours. There is a mention of officer safety because Barnett could have had a gun or guns. But is a gun less of a danger to a lone officer than to officers trained to execute warrants? Why did the threat of danger suddenly arise after five hours expired? Why did the exigency arise only after five hours of doing nothing to seek a warrant?" (p6, dissenting opinion)

2 & 3.

The appeals court likely did not consider a recent Supreme Court case appealed from the U.S. Appeals Court, Eight Circuit, <u>Rodriguez v. U.S.,</u> 575 U.S. _____ , Court No. 13-9972 (2015). The case involves a vehicle stop and subsequent request for a dog sniff of the vehicle. The case applies to the current case because the opinion states,

"We hold that a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures. A seizure justified only by a police-observed traffic violation,

therefore, "become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission" of issuing a ticket for the violation." (p1 opinion)

Even if there had been a legitimate stop of Petitioner, conduct of officers after the stop violated the law regarding unreasonable seizures, as evidence by this Supreme Court case.

## PRAYER FOR RELIEF

Petitioner argued that because the initial arrest violated the Fourth Amendment, any evidence acquired thereafter was tainted by that illegality and, therefore, should be suppressed as the fruits of an illegal arrest.

Petitioner prays that the Court of Criminal Appeals consider the proceedings of the trial court, appeals court and the arguments by the Petitioner, and grant the petition for discretionary review, and reverse and remand the case for further proceedings, as necessary.

Respectfully submitted,

/s/ Mark B. Dewitt
Mark B. Dewitt
Attorney for Petitioner
POB 1274
Granbury, Texas 76048
817-573-1181; Fax 817-573-5110
magby137@yahoo.com

## CERTIFICATE OF SERVICE

A copy of this document was delivered or mailed to:

Petitioner

Matthew Lee Barnett,
Petitioner, TDCJ # 01902805
c/o Gurney Unit
1385 FM 3328
Palestine, Texas 75803

Prosecutor

Robert T. Christian
District Attorney, 355th District Court
Hood County Justice Center
Granbury, Texas 76048

DATED:     June 30, 2015

/s/ Mark B. Dewitt

## Certificate of Compliance with Rule 9.4(i)(2)

Pursuant to Texas Rule of Appellate Procedure 9.4(i)(2) (effective January 1, 2014), this is to certify that this petition complies with the type-volume limitations because it is computer-generated and does not exceed 4,500 words. Using the word-count feature of Microsoft Word, the undersigned certifies that this petition contains 1,839 words in the following sections: the entire document sans appendix exhibits. This petition also complies with the typeface requirements because it has been prepared in a proportionally-spaced typeface using Microsoft Word in 14-point Times New Roman.

**/S/ Mark B. Dewitt**

Mark B. Dewitt

**APPENDIX**

**Page**

1. Second Court of Appeals Opinion for this case ......................................................1

2. Second Court of Appeals Judgment for this case..................................................13

3. Second Court of Appeals Dissenting Opinion for this case .................................14

4. Rodriguez v. U.S., 575 U.S. _____ , Court No. 13-9972 (2015) ...................21



# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-13-00609-CR

MATTHEW LEE BARNETT                                          APPELLANT

V.

THE STATE OF TEXAS                                               STATE

----------

### FROM THE 355TH DISTRICT COURT OF HOOD COUNTY
### TRIAL COURT NO. CR12446

----------

## OPINION

----------

### I. INTRODUCTION

Appellant Matthew Lee Barnett appeals his convictions for possession of less than one gram of methamphetamine and delivery of between four and 200 grams of methamphetamine. In one point, Barnett argues that the trial court abused its discretion by denying his motion to suppress evidence discovered after police stopped him, arrested him, and searched his vehicle and person. We will affirm.

## II. BACKGROUND

The State's charges against Barnett stem from a series of events in which undercover police officers conducted a narcotics purchase from two of Barnett's associates. The fruits of the resulting arrests in that transaction led police to Barnett. After stopping Barnett's vehicle in Granbury, Texas, police arrested him. Following the State's indictment, Barnett filed a motion to suppress evidence stemming from that stop. At the suppression hearing, the State stipulated that they did not stop and search Barnett and his vehicle pursuant to a warrant.

Ray Miller, a narcotics investigator with the Hood County Sheriff's Office, testified that on September 7, 2012, he texted with and then arranged to meet William Youngstrom and Travis Duval in Cresson, Texas, to conduct an undercover narcotics purchase. The deal was for Miller, playing his role as an undercover officer, to meet Youngstrom and Duval at a convenience store, get into Duval's vehicle, and purchase a quarter ounce of methamphetamine for $550. As Miller got into Duval's vehicle, he overheard Duval say to someone on his cellphone, "He just got in." Miller bought methamphetamine from Youngstrom and Duval and then immediately arrested them. Because Youngstrom and Duval were found in possession of 8.5 grams of methamphetamine during the arrest and because they sold the methamphetamine to Miller, both were arrested for delivery of a controlled substance weighing between four and 200 grams, a first-degree felony. *See* Tex. Health & Safety Code § 481.112 (West 2010). During these arrests, Miller confiscated both Youngstrom's and Duval's cellphones.

Soon after, Duval's phone rang and the name "Matt" appeared on the screen. Miller did not answer the call.

Shortly thereafter, however, Youngstrom's phone rang with the same name appearing on the screen. Miller answered this call. According to Miller, the person on the other end of the phone claimed ownership of the methamphetamine and expressed to Miller that Miller owed him money for the drugs. Miller said that during this phone conversation, he left "Matt" with the impression that he had "robbed his couriers."

Miller then transferred "Matt"['s] number to his own phone and began texting with him. Through a series of texts between "Matt" and Miller, the contents of which the State introduced at the suppression hearing, "Matt" indicated again that Duval and Youngstrom were his couriers, that he assumed Miller had robbed them, and that he was willing to do business with Miller "if [they] could get past this particular setback and [Matt] could get his money."

Miller arranged to meet "Matt" in Granbury, a city approximately thirteen miles from Cresson. Approximately five hours after Youngstrom's and Duval's arrests, "Matt" texted that he was ready to meet with Miller. Through texts, "Matt" instructed Miller that he was in a Classic Inn motel in Granbury "five minutes away from Walmart"; that he was on his way to meet Miller at a local restaurant to collect the money regarding the transaction with Youngstrom and Duval; and that he would be driving a "blue Suzuki SUV." Miller said that he and fellow officers were very familiar with this area of Granbury.

During this time, Miller said he was in constant contact with other Hood County Sheriff's officers, relaying them all of this information. Miller said that he had instructed other officers to stop "Matt" before the arranged meetup because, through texts, Miller had come to believe that "Matt" might be in possession of guns and because Miller was concerned that if the meetup occurred, officer safety would be an issue.

Richard Odom, a patrol sergeant for the Hood County Sheriff's Office, also testified at the suppression hearing. He said that he worked with Miller during the events of September 8, 2012. According to Odom, Miller had advised him of the meetup with "Matt." Odom specifically testified that Miller had relayed to him that "Matt" would be in a blue Suzuki SUV near a specific hotel in Granbury and that this vehicle was related to the earlier drug buy involving Youngstrom and Duval. Odom said that he relayed this information to fellow officers, who were also working in conjunction with Miller, and that he witnessed one of the officers, pursuant to Miller's instructions, stop a vehicle matching the description Miller had given in the area where Miller said it would be. Odom said that he was trailing Hood County Sheriff's Deputy Josh Lane as Lane initiated the stop of the blue Suzuki SUV.

Lane also testified at the suppression hearing. Lane said that he began tailing Barnett's vehicle on the night of September 8, 2012, because it matched the description of a vehicle that he had been informed needed to be stopped. Specifically, Lane said that he had "[r]eceived information that a subject was

coming into Granbury by the name of Matt, [who] was supposed to be driving a blue Suzuki, [and] supposed to be coming into town in regards to a . . . narcotics arrest made earlier in the day in Cresson." Lane said that he initially followed the "blue Suzuki SUV" because it was near "a hotel . . . about five minutes from the local Walmart," a location he had learned from other officers would be where "Matt" would be found. Like the other officers who testified, Lane said that he was very familiar with that area of Granbury. Lane averred that he followed Barnett for a short time to see if he would commit a traffic violation.

According to Lane, as Barnett neared "the location where [he] was supposed to go to meet" Miller, he initiated a traffic stop, ostensibly because Barnett had failed to maintain driving in a single lane. After stopping Barnett, Lane "ran the license plate" and discovered that Barnett's first name was "Matthew." From there, Lane asked Barnett if he would consent to a vehicle search. By Lane's account, Barnett initially replied that he did not want Lane to "tear up his car," but after Lane reassured him that he would not tear up the vehicle, Barnett consented to a search.

While searching Barnett's vehicle, another deputy discovered an unlocked safe in the trunk of the vehicle. Upon opening the safe, Lane said he "detected the strong odor of marijuana" emanating from the safe. He also found "plastic spoons, needles, [and] cut-off straws with a crystal-like substance inside them." He then placed Barnett under arrest. Further searching of the vehicle revealed

marijuana seeds and a cigarette pack found in the passenger area containing 0.23 grams of methamphetamine.

At the close of the suppression hearing, the trial court denied Barnett's motion to suppress. In its findings of fact and conclusions of law, the trial court specifically found that at the time of the stop, Lane had received enough information from other officers to have formed a reasonable suspicion that Barnett was a party to the transaction that occurred earlier that day in Cresson, and that therefore Lane had reasonable suspicion that Barnett was engaged in criminal activity. The trial court also specifically found that Barnett had "freely and voluntarily consented to the officers' search of his vehicle."

A jury returned a verdict of guilty on both of the State's charges—possession of a controlled substance less than one gram and, as a party to the offense, delivery of a controlled substance between four and 200 grams. The jury assessed punishment at two years' confinement for the possession charge and forty years' confinement for the delivery charge. The trial court entered judgment accordingly, ordering the sentences to run concurrently, and this appeal followed.

## III. DISCUSSION

In his sole point, Barnett states that he is contesting "the validity of the traffic stop and its duration." Among the arguments contained in his sole point regarding his contention that the trial court erred by not suppressing the evidence, Barnett argues that he did not commit a traffic offense in Lane's

presence; that the duration of Lane's detention, based on an alleged traffic violation, surpassed the necessary time to obtain his consent to search his vehicle; and that Lane did not have probable cause to arrest him for his involvement in the arrests earlier in the day in Cresson. Barnett goes on to argue that because the evidence he sought to suppress "was the basis of the charges for which [he] was convicted," his convictions should be reversed. We disagree.

We first note that Barnett did not argue at the trial court specifically what evidence the trial court should have suppressed. *See Miller v. State*, 312 S.W.3d 162, 166 (Tex. App.—Fort Worth 2010, no pet.) ("Nowhere, though, has Appellant identified the specific items of evidence or categories of evidence he sought to exclude by challenging the three search warrants."); *see also Brennan v. State*, 140 S.W.3d 779, 781 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd) (holding global request to suppress "all evidence seized or obtained" from alleged illegal searches and failure "to identify what, if any, evidence was ruled upon by the denial" presented nothing for appellate review). In his suppression motion filed in the trial court, Barnett requested that "[a]ll evidence, both physical evidence as well as statements by [Barnett], collected as a result of the traffic stop in this case should be suppressed." On appeal, Barnett has requested that this court reverse the trial court's order denying his motion to suppress and hold that the trial court should have suppressed "any items found in the SUV or on [his] person after the traffic stop, including but not limited to: phones, straws, baggies and scales." Thus, there is authority to suggest that Barnett has not

preserved his point for our review. *See Swain v. State*, 181 S.W.3d 359, 365 (Tex. Crim. App. 2005), *cert. denied*, 549 U.S. 861 (2006) ("Appellant's global statements in his pretrial motion to suppress were not sufficiently specific to preserve the arguments he now makes on appeal.").

But even considering Barnett's argument that all the evidence gathered from his vehicle, "as well as statements [made]" after Lane detained him, should have been suppressed, Barnett's sole point on appeal must be overruled because he fails to challenge a ground stated by the trial court in its findings of fact and conclusions of law as to why Lane's stopping of Barnett was in fact constitutionally firm—that Lane had reasonable suspicion that Barnett was a party to the methamphetamine sale that occurred in Cresson prior to Lane having stopped him.

### A.    Standard of Review

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We give almost total deference to a trial court's rulings on questions of historical fact and application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor, but we review de novo application-of-law-to-fact questions that do not turn on credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002).

It is a longstanding rule that an appellate court must uphold the trial court's order on a motion to suppress "on any theory of law applicable to the case." *See State v. Esparza*, 413 S.W.3d 81, 85 (Tex. Crim. App. 2013) (*citing Calloway v. State*, 743 S.W.2d 645, 651–52 (Tex. Crim. App. 1988)); *see also Alford v. State*, 400 S.W.3d 924, 929 (Tex. Crim. App. 2013) (holding that conclusions of law are reviewed de novo so that trial court's order is upheld under any legal theory supported by the facts).

## B.  Lane's Reasonable Suspicion

Even though Lane testified that one of the reasons he initiated a traffic stop of Barnett's vehicle was because Barnett had failed to maintain a single lane of traffic, the trial court did not make such a finding.  Instead, the trial court specifically found that Lane had reasonable suspicion to stop Barnett based on the information he had received from fellow officers regarding Barnett's involvement in the arrests of Youngstrom and Duval.  This finding is supported by the law and the facts as determined at the suppression hearing.

Under the Fourth Amendment, a warrantless detention of a person that amounts to less than a full-blown custodial arrest must be justified by reasonable suspicion.  *Derichsweiler v. State*, 348 S.W.3d 906, 914 (Tex. Crim. App.), *cert. denied*, ___ U.S. ___, 132 S. Ct. 150 (2011).  A police officer has reasonable suspicion to detain if he has specific, articulable facts that, combined with rational inferences from those facts, would lead him to reasonably conclude that the person detained is, has been, or soon will be engaged in criminal activity.  *Id.*

This standard is an objective one that disregards the actual subjective intent of the arresting officer and looks, instead, to whether there was an objectively justifiable basis for the detention. *Id.* It also looks to the totality of the circumstances—those circumstances may all seem innocent enough in isolation, but if they combine to reasonably suggest the imminence of criminal conduct, an investigative detention is justified. *Id.* The relevant inquiry is not whether particular conduct is innocent or criminal, but the degree of suspicion that attaches to particular noncriminal acts. *Woods v. State*, 956 S.W.2d 33, 38 (Tex. Crim. App. 1997). Moreover, the detaining officer need not be personally aware of every fact that objectively supports a reasonable suspicion to detain; rather, the cumulative information known to the cooperating officers at the time of the stop is to be considered in determining whether reasonable suspicion exists. *Derichsweiler*, 348 S.W.3d at 914.

Here, despite Barnett's contention that the only reason Lane gave at the suppression hearing for stopping him was a perceived traffic violation, Lane testified that other cooperating officers had relayed to him specific, articulable facts that, when combined with rational inferences, would have led him to believe that Barnett was involved in the transaction that led to the arrests of Youngstrom and Duval earlier that day. Lane testified that he had received information that a "Matt" was coming into Granbury "in regards to a transaction or narcotics arrest made earlier in the day in Cresson." Lane also testified that he stopped Barnett's "blue Suzuki SUV" because it was near "a hotel . . . about five minutes from the

local Walmart," a location he had learned from other officers would be where Barnett's vehicle would be found. And like the other officers who testified, Lane said that he was very familiar with that area of Granbury. In its findings of fact, the trial court found this testimony to be credible.

We hold that the trial court did not abuse its discretion by finding that Lane had reasonable suspicion to stop Barnett's vehicle. *See Orsag v. State*, 312 S.W.3d 105, 114 (Tex. App.—Houston [14th Dist.] 2010, pet ref'd) (holding that officer had reasonable suspicion to stop defendant's vehicle for speeding after receiving information from fellow officer describing the make, model, and location of defendant's vehicle); *see also Francis v. State*, No. 08-03-00316-CR, 2005 WL 1208142, at *2 (Tex. App.—El Paso May 19, 2005, no pet.) (not designated for publication) ("The undercover officer had first-hand knowledge of the offense and relayed that knowledge to his fellow officers.").

## C.    Barnett Consented to Lane's Search of His Vehicle

In another portion of Barnett's sole point, he contends that the duration of Lane's stop exceeded the necessary duration applicable to a traffic violation. Again we note that the trial court did not make an explicit finding of fact or conclusion of law that Lane stopped Barnett for a traffic violation. We do, however, conclude that the trial court's finding of fact that Barnett consented to an unlimited search of his vehicle is supported by the facts adduced at the suppression hearing.

We also find support in the record for the trial court's conclusion of law that Barnett "freely and voluntarily consented to the officers' search of his vehicle" and that such consent was "positive and unequivocal." This conclusion is based on Lane's testimony that Barnett expressly consented to the search, which the trial court found to be true. *See James v. State*, 102 S.W.3d 162, 173 (Tex. App.—Fort Worth 2003, pet. ref'd) ("[R]easonable suspicion is not required for a police officer to request consent to search an automobile after the reason for an initial stop is concluded as long as a message is not conveyed that compliance is required.").

## IV. CONCLUSION

We hold that the trial court did not abuse its discretion by denying Barnett's motion to suppress. Thus, we overrule Barnett's sole point and affirm the trial court's judgments.

/s/ Bill Meier

BILL MEIER
JUSTICE

PANEL: DAUPHINOT, GARDNER, and MEIER, JJ.

Dauphinot, J., filed a dissenting opinion.

PUBLISH

DELIVERED: June 18, 2015

12



# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-13-00609-CR

| | | |
|---|---|---|
| Matthew Lee Barnett | § | From the 355th District Court |
| | § | of Hood County (CR12446) |
| | § | June 18, 2015 |
| v. | § | Opinion by Justice Meier |
| | § | Dissent by Justice Dauphinot |
| The State of Texas | § | (p) |

## JUDGMENT

This court has considered the record on appeal in this case and holds that there was no error in the trial court's judgments. It is ordered that the judgments of the trial court are affirmed.

SECOND DISTRICT COURT OF APPEALS

By /s/ Bill Meier
Justice Bill Meier



# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-13-00609-CR

MATTHEW LEE BARNETT                                          APPELLANT

V.

THE STATE OF TEXAS                                                STATE

----------

### FROM THE 355TH DISTRICT COURT OF HOOD COUNTY
### TRIAL COURT NO. CR12446

----------

## DISSENTING OPINION

----------

I must respectfully dissent from the opinion of the conscientious majority for more than one reason.

The majority, relying on *Swain v. State*,[1] holds that Barnett did not preserve his suppression issue for appellate review. The *Swain* court stated,

---

[1]181 S.W.3d 359 (Tex. Crim. App. 2005), *cert. denied*, 549 U.S. 861 (2006).

In his written "Motion to Suppress Evidence," appellant generally argued "[t]hat any statements made by Defendant were obtained in violation of his right to counsel and his right against self-incrimination as guaranteed by U.S. Const. amends. V, VI, and XIV, and Tex. Const. art. I, §§ 10 and 19." He also generally argued in his motion to suppress that his statements were inadmissible under Article 38.23. These arguments were global in nature and contained little more than citations to constitutional and statutory provisions. At the hearing on the motion to suppress, appellant failed to complain about being questioned after asserting his right to counsel, and instead simply objected that his statements were inadmissible because the police illegally arrested him and failed to comply with the requirements of Articles 38.22, 14.03, and 14.06. Appellant's global statements in his pretrial motion to suppress were not sufficiently specific to preserve the arguments he now makes on appeal.[2]

*Swain* turns on the fact that Swain argued constitutional rights generally in the trial court but only on appeal did he raise the fact that he had requested counsel and was denied access to counsel. Thus, the *Swain* trial court was not put on notice of his true complaint.

In the case now before this court, both in the trial court and on appeal, Barnett complained of the admission of the fruits of the poisonous tree: that "[a]ll evidence, both physical evidence as well as [his] statements . . . , collected as a result of the traffic stop in this case should be suppressed." It is true that after trial, Barnett was able to list the specific items that had been admitted into evidence during the trial, but the trial court was on notice of the items Barnett sought to suppress—his statement and the items the police seized when they searched the car and Barnett—as well as the reasons for which they should be

---

[2]*Id.* (citing Tex. R. App. P. 33.1).

2

suppressed. The posture of this case is not that of *Swain.* I would hold that Barnett sufficiently preserved his suppression issue for appellate review.

I would also hold that the warrantless detention of Barnett was not justified. "The Fourth Amendment to the United States Constitution permits a warrantless detention of a person, short of a full-blown custodial arrest, if the detention is justified by reasonable suspicion."[3] The legality of traffic stops for Fourth Amendment purposes is subject to analysis under the *Terry* standard,[4] that is, whether the officer's action was justified at its inception and whether the search and seizure were reasonably related in scope to the circumstances that justified the stop in the first place.[5]

Barnett argues that Deputy Lane saw no real traffic offense. The trial court did not find or conclude that Barnett committed a traffic offense in Lane's presence. The majority essentially holds that because Barnett did not challenge one of the grounds for denying the criminal version of summary judgment, he loses:

> Barnett's sole point on appeal must be overruled because he fails to challenge a ground stated by the trial court in its findings of fact and conclusions of law as to why Lane's stopping of Barnett was in fact constitutionally firm—that Lane had reasonable suspicion that

---

[3]*Johnson v. State*, 414 S.W.3d 184, 191 (Tex. Crim. App. 2013).

[4]*Terry v. Ohio*, 392 U.S. 1, 28, 88 S. Ct. 1868, 1883 (1968).

[5]*See Kothe v. State*, 152 S.W.3d 54, 62 (Tex. Crim. App. 2004).

3

Barnett was a party to the methamphetamine sale that occurred in Cresson prior to Lane having stopped him.[6]

Respectfully, the term "reasonable suspicion" is not a magic talisman that suspends the protections of the Fourth Amendment's warrant requirement. As Justice Marshall explained in his *Sokolow* dissent,

> The reasonable-suspicion standard is a derivation of the probable-cause command, applicable only to those brief detentions which fall short of being full-scale searches and seizures and which are necessitated by law enforcement exigencies such as the need to stop ongoing crimes, to prevent imminent crimes, and to protect law enforcement officers in highly charged situations.[7]

The timeline of events was

- 2:30 p.m.—meeting for methamphetamine sale

- 2:52 p.m.—initial negotiations to meet for drug transaction with Appellant

- 6:30 p.m.—Appellant said they could meet at 10:00 p.m.

- 11:15 p.m.—Officer Miller told patrol officer to stop Appellant.

If the ground justifying the seizure of Barnett was that he was a party to the methamphetamine sale that occurred nine hours earlier in Cresson, why is there no warrant? Miller, the undercover officer, arranged to meet with Appellant five hours before the arrest. What is the warrant exception that justifies suspending the warrant requirement? Again, the trial court did not find that the officer viewed

---

[6]Maj. Op. at 8.

[7]*United States v. Sokolow*, 490 U.S. 1, 12, 109 S. Ct. 1581, 1588 (1989) (Marshall, J., dissenting).

a traffic violation; the record therefore clearly reflects that the purpose of stopping Barnett was to search and arrest him.

Reasonable suspicion will not support an arrest.[8] A warrantless arrest must be founded on probable cause plus a recognized exception to the warrant requirement. Probable cause is a higher standard than reasonable suspicion.[9] Probable cause will support a warrant. In the more than five hours that the police waited for Barnett, they made no effort to secure a warrant. Nor does the State suggest any impediment to securing the warrant. There is also no evidence of an exigency.

Somehow, we seem to have concluded in Texas that reasonable suspicion takes the place of the constitutional warrant requirement. This is simply not true. Reasonable suspicion supports an investigation into whether a crime has been or is being committed. If, as the trial court found and the majority accepts, the police were justified in arresting Barnett because he had been a party to the drug transaction, what evidence of that transaction did the police expect to find when they stopped his car and detained him? What was the exigency that prevented

---

[8]*Wade v. State*, 422 S.W.3d 661, 667 (Tex. Crim. App. 2013) ("[A]rrests, the most intrusive of Fourth Amendment seizures, . . . are reasonable only if supported by probable cause.").

[9]*Rhoades v. State*, 84 S.W.3d 10, 15 n.2 (Tex. App.—Texarkana 2002, no pet.) ("The rule in *Terry* permits 'stop and frisk' searches for guns, knives, clubs, or other weapons for the purpose of protecting the police officer and others nearby on the basis of reasonable suspicion that the subject of the search might be armed and dangerous, rather than demanding that officers meet the higher standard of probable cause.").

their seeking a warrant during the five hours they did not act? There is no evidence in the record that Barnett was in possession of evidence of the drug transaction that he would destroy as soon as the timer hit five hours. There is no evidence that he would flee when the timer hit five hours. There is a mention of officer safety because Barnett could have had a gun or guns. But why were the guns less of a danger to a lone officer than to officers trained to execute warrants? Why did the threat of danger suddenly arise after five hours expired? Why did the exigency arise only after five hours of doing nothing to seek a warrant?

In this case, the arresting officer admitted that he was looking for a pretext to stop Barnett and search his car. As Barnett argues,

> Under cross-examination, Lane stated that the reason for the traffic stop was the driver's violation of Texas Transportation Code §545.060(a)(1). Lane testified that he had committed in his mind to pull over Appellant's vehicle for some traffic offense, based on the information that he had received from Sgt. Odom.

> Lane testified that Appellant's crossing of the white line occurred for just a few seconds and a short distance (18 inches) into the other lane. Lane testified that there were no cars in the lane beside the lane in which Appellant was driving, nor was there a car in the lane adjacent to that lane or even in the lane to the right of that lane. Lane's in-car video shows the Appellant's car as it negotiated the left hand turn as it was being stopped by the officer.

> Lane had not returned Appellant's license and had not said that Appellant was free to leave prior to the time that he asked to search Appellant's vehicle. [Record citations omitted.]

But as the majority points out, the trial court did not find that the police based the detention on a perceived traffic violation. The trial court found only that the police detained Barnett for the reported drug offense:

> Even though Lane testified that one of the reasons he initiated a traffic stop of Barnett's vehicle was because Barnett had failed to maintain a single lane of traffic, the trial court did not make such a finding. Instead, the trial court specifically found that Lane had reasonable suspicion to stop Barnett based on the information he had received from fellow officers regarding Barnett's involvement in the arrests of Youngstrom and Duval. This finding is supported by the law and the facts as determined at the suppression hearing.[10]

The issue is not whether the police had sufficient information to provide probable cause. The issue is why no request for a warrant was submitted to the scrutiny of a detached, neutral magistrate. Nothing in the record suggests that no magistrate was available. The majority does not explain what "law enforcement exigenc[y]" necessitated this warrantless detention or which exception to the warrant requirement justifies the warrantless detention. Because the majority does not explain how the warrantless detention based on information that Barnett had acted as a party to a crime five hours earlier is "constitutionally firm," I must respectfully dissent.

/s/ Lee Ann Dauphinot
LEE ANN DAUPHINOT
JUSTICE

PUBLISH

DELIVERED: June 18, 2015

---

[10]Maj. Op. at 9.

7

(Slip Opinion)     OCTOBER TERM, 2014

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## RODRIGUEZ *v.* UNITED STATES

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

No. 13–9972.   Argued January 21, 2015—Decided April 21, 2015

Officer Struble, a K–9 officer, stopped petitioner Rodriguez for driving on a highway shoulder, a violation of Nebraska law. After Struble attended to everything relating to the stop, including, *inter alia,* checking the driver's licenses of Rodriguez and his passenger and issuing a warning for the traffic offense, he asked Rodriguez for permission to walk his dog around the vehicle. When Rodriguez refused, Struble detained him until a second officer arrived. Struble then retrieved his dog, who alerted to the presence of drugs in the vehicle. The ensuing search revealed methamphetamine. Seven or eight minutes elapsed from the time Struble issued the written warning until the dog alerted.

Rodriguez was indicted on federal drug charges. He moved to suppress the evidence seized from the vehicle on the ground, among others, that Struble had prolonged the traffic stop without reasonable suspicion in order to conduct the dog sniff. The Magistrate Judge recommended denial of the motion. He found no reasonable suspicion supporting detention once Struble issued the written warning. Under Eighth Circuit precedent, however, he concluded that prolonging the stop by "seven to eight minutes" for the dog sniff was only a *de minimis* intrusion on Rodriguez's Fourth Amendment rights and was for that reason permissible. The District Court then denied the motion to suppress. Rodriguez entered a conditional guilty plea and was sentenced to five years in prison. The Eighth Circuit affirmed. Noting that the seven or eight minute delay was an acceptable "*de minimis* intrusion on Rodriguez's personal liberty," the court declined to reach the question whether Struble had reasonable suspicion to continue Rodriguez's detention after issuing the written warning.

Held:

2                    RODRIGUEZ *v.* UNITED STATES

Syllabus

1. Absent reasonable suspicion, police extension of a traffic stop
in order to conduct a dog sniff violates the Constitution's shield
against unreasonable seizures.

A routine traffic stop is more like a brief stop under *Terry* v. *Ohio*,
392 U. S. 1, than an arrest, see, *e.g., Arizona* v. *Johnson*, 555 U. S.
323, 330. Its tolerable duration is determined by the seizure's "mis-
sion," which is to address the traffic violation that warranted the
stop, *Illinois* v. *Caballes*, 543 U. S. 405, 407 and attend to related
safety concerns. Authority for the seizure ends when tasks tied to
the traffic infraction are—or reasonably should have been—
completed. The Fourth Amendment may tolerate certain unrelated
investigations that do not lengthen the roadside detention, *Johnson*,
555 U. S., at 327–328 (questioning); *Caballes*, 543 U. S., at 406, 408
(dog sniff), but a traffic stop "become[s] unlawful if it is prolonged be-
yond the time reasonably required to complete th[e] mission" of issu-
ing a warning ticket, *id.,* at 407.

Beyond determining whether to issue a traffic ticket, an officer's
mission during a traffic stop typically includes checking the driver's
license, determining whether there are outstanding warrants against
the driver, and inspecting the automobile's registration and proof of
insurance. These checks serve the same objective as enforcement of
the traffic code: ensuring that vehicles on the road are operated safe-
ly and responsibly. See *Delaware* v. *Prouse*, 440 U. S. 648, 658–659.
Lacking the same close connection to roadway safety as the ordinary
inquiries, a dog sniff is not fairly characterized as part of the officer's
traffic mission.

In concluding that the *de minimis* intrusion here could be offset by
the Government's interest in stopping the flow of illegal drugs, the
Eighth Circuit relied on *Pennsylvania* v. *Mimms*, 434 U. S. 106. The
Court reasoned in *Mimms* that the government's "legitimate and
weighty" interest in officer safety outweighed the "*de minimis*" addi-
tional intrusion of requiring a driver, lawfully stopped, to exit a vehi-
cle, *id.,* at 110–111. The officer-safety interest recognized in *Mimms*,
however, stemmed from the danger to the officer associated with the
traffic stop itself. On-scene investigation into other crimes, in con-
trast, detours from the officer's traffic-control mission and therefore
gains no support from *Mimms*.

The Government's argument that an officer who completes all traf-
fic-related tasks expeditiously should earn extra time to pursue an
unrelated criminal investigation is unpersuasive, for a traffic stop
"prolonged beyond" the time in fact needed for the officer to complete
his traffic-based inquiries is "unlawful," *Caballes*, 543 U. S., at 407.
The critical question is not whether the dog sniff occurs before or af-
ter the officer issues a ticket, but whether conducting the sniff adds

Syllabus

time to the stop. Pp. 5–8.

2. The determination adopted by the District Court that detention for the dog sniff was not independently supported by individualized suspicion was not reviewed by the Eighth Circuit. That question therefore remains open for consideration on remand. P. 9.

741 F. 3d 905, vacated and remanded.

GINSBURG, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, BREYER, SOTOMAYOR, and KAGAN, JJ., joined. KENNEDY, J., filed a dissenting opinion. THOMAS, J., filed a dissenting opinion, in which ALITO, J., joined, and in which KENNEDY, J., joined as to all but Part III. ALITO, J., filed a dissenting opinion.

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 13–9972

### DENNYS RODRIGUEZ, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

[April 21, 2015]

JUSTICE GINSBURG delivered the opinion of the Court.

In *Illinois* v. *Caballes*, 543 U. S. 405 (2005), this Court held that a dog sniff conducted during a lawful traffic stop does not violate the Fourth Amendment's proscription of unreasonable seizures. This case presents the question whether the Fourth Amendment tolerates a dog sniff conducted after completion of a traffic stop. We hold that a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures. A seizure justified only by a police-observed traffic violation, therefore, "become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission" of issuing a ticket for the violation. *Id.*, at 407. The Court so recognized in *Caballes*, and we adhere to the line drawn in that decision.

I

Just after midnight on March 27, 2012, police officer Morgan Struble observed a Mercury Mountaineer veer slowly onto the shoulder of Nebraska State Highway 275 for one or two seconds and then jerk back onto the road.

2          RODRIGUEZ *v.* UNITED STATES

Nebraska law prohibits driving on highway shoulders, see Neb. Rev. Stat. §60–6,142 (2010), and on that basis, Struble pulled the Mountaineer over at 12:06 a.m. Struble is a K–9 officer with the Valley Police Department in Nebraska, and his dog Floyd was in his patrol car that night. Two men were in the Mountaineer: the driver, Dennys Rodriguez, and a front-seat passenger, Scott Pollman.

Struble approached the Mountaineer on the passenger's side. After Rodriguez identified himself, Struble asked him why he had driven onto the shoulder. Rodriguez replied that he had swerved to avoid a pothole. Struble then gathered Rodriguez's license, registration, and proof of insurance, and asked Rodriguez to accompany him to the patrol car. Rodriguez asked if he was required to do so, and Struble answered that he was not. Rodriguez decided to wait in his own vehicle.

After running a records check on Rodriguez, Struble returned to the Mountaineer. Struble asked passenger Pollman for his driver's license and began to question him about where the two men were coming from and where they were going. Pollman replied that they had traveled to Omaha, Nebraska, to look at a Ford Mustang that was for sale and that they were returning to Norfolk, Nebraska. Struble returned again to his patrol car, where he completed a records check on Pollman, and called for a second officer. Struble then began writing a warning ticket for Rodriguez for driving on the shoulder of the road.

Struble returned to Rodriguez's vehicle a third time to issue the written warning. By 12:27 or 12:28 a.m., Struble had finished explaining the warning to Rodriguez, and had given back to Rodriguez and Pollman the documents obtained from them. As Struble later testified, at that point, Rodriguez and Pollman "had all their documents back and a copy of the written warning. I got all the reason[s] for the stop out of the way[,] . . . took care of all

the business." App. 70.

Nevertheless, Struble did not consider Rodriguez "free to leave." *Id.,* at 69–70. Although justification for the traffic stop was "out of the way," *id.,* at 70, Struble asked for permission to walk his dog around Rodriguez's vehicle. Rodriguez said no. Struble then instructed Rodriguez to turn off the ignition, exit the vehicle, and stand in front of the patrol car to wait for the second officer. Rodriguez complied. At 12:33 a.m., a deputy sheriff arrived. Struble retrieved his dog and led him twice around the Mountaineer. The dog alerted to the presence of drugs halfway through Struble's second pass. All told, seven or eight minutes had elapsed from the time Struble issued the written warning until the dog indicated the presence of drugs. A search of the vehicle revealed a large bag of methamphetamine.

Rodriguez was indicted in the United States District Court for the District of Nebraska on one count of possession with intent to distribute 50 grams or more of methamphetamine, in violation of 21 U. S. C. §§841(a)(1) and (b)(1). He moved to suppress the evidence seized from his car on the ground, among others, that Struble had prolonged the traffic stop without reasonable suspicion in order to conduct the dog sniff.

After receiving evidence, a Magistrate Judge recommended that the motion be denied. The Magistrate Judge found no probable cause to search the vehicle independent of the dog alert. App. 100 (apart from "information given by the dog," "Officer Struble had [no]thing other than a rather large hunch"). He further found that no reasonable suspicion supported the detention once Struble issued the written warning. He concluded, however, that under Eighth Circuit precedent, extension of the stop by "seven to eight minutes" for the dog sniff was only a *de minimis* intrusion on Rodriguez's Fourth Amendment rights and was therefore permissible.

Opinion of the Court

The District Court adopted the Magistrate Judge's factual findings and legal conclusions and denied Rodriguez's motion to suppress. The court noted that, in the Eighth Circuit, "dog sniffs that occur within a short time following the completion of a traffic stop are not constitutionally prohibited if they constitute only de minimis intrusions." App. 114 (quoting *United States* v. *Alexander*, 448 F. 3d 1014, 1016 (CA8 2006)). The court thus agreed with the Magistrate Judge that the "7 to 10 minutes" added to the stop by the dog sniff "was not of constitutional significance." App. 114. Impelled by that decision, Rodriguez entered a conditional guilty plea and was sentenced to five years in prison.

The Eighth Circuit affirmed. The "seven- or eight-minute delay" in this case, the opinion noted, resembled delays that the court had previously ranked as permissible. 741 F. 3d 905, 907 (2014). The Court of Appeals thus ruled that the delay here constituted an acceptable "*de minimis* intrusion on Rodriguez's personal liberty." *Id.,* at 908. Given that ruling, the court declined to reach the question whether Struble had reasonable suspicion to continue Rodriguez's detention after issuing the written warning.

We granted certiorari to resolve a division among lower courts on the question whether police routinely may extend an otherwise-completed traffic stop, absent reasonable suspicion, in order to conduct a dog sniff. 573 U. S. ___ (2014). Compare, *e.g., United States* v. *Morgan*, 270 F. 3d 625, 632 (CA8 2001) (postcompletion delay of "well under ten minutes" permissible), with, *e.g., State* v. *Baker*, 2010 UT 18, ¶13, 229 P. 3d 650, 658 (2010) ("[W]ithout additional reasonable suspicion, the officer must allow the seized person to depart once the purpose of the stop has concluded.").

Opinion of the Court

## II

A seizure for a traffic violation justifies a police investigation of that violation. "[A] relatively brief encounter," a routine traffic stop is "more analogous to a so-called '*Terry* stop' . . . than to a formal arrest." *Knowles* v. *Iowa*, 525 U. S. 113, 117 (1998) (quoting *Berkemer* v. *McCarty*, 468 U. S. 420, 439 (1984), in turn citing *Terry* v. *Ohio*, 392 U. S. 1 (1968)). See also *Arizona* v. *Johnson*, 555 U. S. 323, 330 (2009). Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's "mission"—to address the traffic violation that warranted the stop, *Caballes*, 543 U. S., at 407, and attend to related safety concerns, *infra*, at 6–7. See also *United States* v. *Sharpe*, 470 U. S. 675, 685 (1985); *Florida* v. *Royer*, 460 U. S. 491, 500 (1983) (plurality opinion) ("The scope of the detention must be carefully tailored to its underlying justification."). Because addressing the infraction is the purpose of the stop, it may "last no longer than is necessary to effectuate th[at] purpose." *Ibid.* See also *Caballes*, 543 U. S., at 407. Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed. See *Sharpe*, 470 U. S., at 686 (in determining the reasonable duration of a stop, "it [is] appropriate to examine whether the police diligently pursued [the] investigation").

Our decisions in *Caballes* and *Johnson* heed these constraints. In both cases, we concluded that the Fourth Amendment tolerated certain unrelated investigations that did not lengthen the roadside detention. *Johnson*, 555 U. S., at 327–328 (questioning); *Caballes*, 543 U. S., at 406, 408 (dog sniff). In *Caballes*, however, we cautioned that a traffic stop "can become unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission" of issuing a warning ticket. 543 U. S., at 407. And we repeated that admonition in *Johnson*: The seizure remains lawful only "so long as [unrelated] inquiries do

not measurably extend the duration of the stop." 555 U. S., at 333. See also *Muehler* v. *Mena*, 544 U. S. 93, 101 (2005) (because unrelated inquiries did not "exten[d] the time [petitioner] was detained[,] . . . no additional Fourth Amendment justification . . . was required"). An officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop. But contrary to JUSTICE ALITO's suggestion, *post,* at 4, n. 2, he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual. But see *post*, at 1–2 (ALITO, J., dissenting) (premising opinion on the dissent's own finding of "reasonable suspicion," although the District Court reached the opposite conclusion, and the Court of Appeals declined to consider the issue).

Beyond determining whether to issue a traffic ticket, an officer's mission includes "ordinary inquiries incident to [the traffic] stop." *Caballes*, 543 U. S., at 408. Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. See *Delaware* v. *Prouse*, 440 U. S. 648, 658–660 (1979). See also 4 W. LaFave, Search and Seizure §9.3(c), pp. 507–517 (5th ed. 2012). These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly. See *Prouse,* 440 U. S., at 658–659; LaFave, Search and Seizure §9.3(c), at 516 (A "warrant check makes it possible to determine whether the apparent traffic violator is wanted for one or more previous traffic offenses.").

A dog sniff, by contrast, is a measure aimed at "detect[ing] evidence of ordinary criminal wrongdoing." *Indianapolis* v. *Edmond*, 531 U. S. 32, 40–41 (2000). See also *Florida* v. *Jardines*, 569 U. S. 1, ___–___ (2013) (slip op., at 7–8). Candidly, the Government acknowledged at

oral argument that a dog sniff, unlike the routine measures just mentioned, is not an ordinary incident of a traffic stop. See Tr. of Oral Arg. 33. Lacking the same close connection to roadway safety as the ordinary inquiries, a dog sniff is not fairly characterized as part of the officer's traffic mission.

In advancing its *de minimis* rule, the Eighth Circuit relied heavily on our decision in *Pennsylvania* v. *Mimms*, 434 U. S. 106 (1977) (*per curiam*). See *United States* v. *$404,905.00 in U. S. Currency*, 182 F. 3d 643, 649 (CA8 1999). In *Mimms*, we reasoned that the government's "legitimate and weighty" interest in officer safety outweighs the "*de minimis*" additional intrusion of requiring a driver, already lawfully stopped, to exit the vehicle. 434 U. S., at 110–111. See also *Maryland* v. *Wilson*, 519 U. S. 408, 413–415 (1997) (passengers may be required to exit vehicle stopped for traffic violation). The Eighth Circuit, echoed in JUSTICE THOMAS's dissent, believed that the imposition here similarly could be offset by the Government's "strong interest in interdicting the flow of illegal drugs along the nation's highways." *$404,905.00 in U. S. Currency*, 182 F. 3d, at 649; see *post,* at 9.

Unlike a general interest in criminal enforcement, however, the government's officer safety interest stems from the mission of the stop itself. Traffic stops are "especially fraught with danger to police officers," *Johnson*, 555 U. S., at 330 (internal quotation marks omitted), so an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely. Cf. *United States* v. *Holt*, 264 F. 3d 1215, 1221–1222 (CA10 2001) (en banc) (recognizing officer safety justification for criminal record and outstanding warrant checks), abrogated on other grounds as recognized in *United States* v. *Stewart*, 473 F. 3d 1265, 1269 (CA10 2007). On-scene investigation into other crimes, however, detours from that mission. See *supra,* at 6–7. So too do safety precau-

tions taken in order to facilitate such detours. But cf. *post,* at 2–3 (ALITO, J., dissenting). Thus, even assuming that the imposition here was no more intrusive than the exit order in *Mimms*, the dog sniff could not be justified on the same basis. Highway and officer safety are interests different in kind from the Government's endeavor to detect crime in general or drug trafficking in particular.

The Government argues that an officer may "incremental[ly]" prolong a stop to conduct a dog sniff so long as the officer is reasonably diligent in pursuing the traffic-related purpose of the stop, and the overall duration of the stop remains reasonable in relation to the duration of other traffic stops involving similar circumstances. Brief for United States 36–39. The Government's argument, in effect, is that by completing all traffic-related tasks expeditiously, an officer can earn bonus time to pursue an unrelated criminal investigation. See also *post,* at 2–5 (THOMAS, J., dissenting) (embracing the Government's argument). The reasonableness of a seizure, however, depends on what the police in fact do. See *Knowles*, 525 U. S., at 115–117. In this regard, the Government acknowledges that "an officer always has to be reasonably diligent." Tr. of Oral Arg. 49. How could diligence be gauged other than by noting what the officer actually did and how he did it? If an officer can complete traffic-based inquiries expeditiously, then that is the amount of "time reasonably required to complete [the stop's] mission." *Caballes*, 543 U. S., at 407. As we said in *Caballes* and reiterate today, a traffic stop "prolonged beyond" that point is "unlawful." *Ibid.* The critical question, then, is not whether the dog sniff occurs before or after the officer issues a ticket, as JUSTICE ALITO supposes, *post,* at 2–4, but whether conducting the sniff "prolongs"—*i.e.,* adds time to—"the stop," *supra,* at 6.

Opinion of the Court

### III

The Magistrate Judge found that detention for the dog sniff in this case was not independently supported by individualized suspicion, see App. 100, and the District Court adopted the Magistrate Judge's findings, see *id.*, at 112–113. The Court of Appeals, however, did not review that determination. But see *post,* at 1, 10–12 (THOMAS, J., dissenting) (resolving the issue, nevermind that the Court of Appeals left it unaddressed); *post,* at 1–2 (ALITO, J., dissenting) (upbraiding the Court for addressing the sole issue decided by the Court of Appeals and characterizing the Court's answer as "unnecessary" because the Court, instead, should have decided an issue the Court of Appeals did not decide). The question whether reasonable suspicion of criminal activity justified detaining Rodriguez beyond completion of the traffic infraction investigation, therefore, remains open for Eighth Circuit consideration on remand.

\*    \*    \*

For the reasons stated, the judgment of the United States Court of Appeals for the Eighth Circuit is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 13–9972

_____

## DENNYS RODRIGUEZ, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE EIGHTH CIRCUIT

[April 21, 2015]

JUSTICE KENNEDY, dissenting.

My join in JUSTICE THOMAS' dissenting opinion does not extend to Part III. Although the issue discussed in that Part was argued here, the Court of Appeals has not addressed that aspect of the case in any detail. In my view the better course would be to allow that court to do so in the first instance.

THOMAS, J., dissenting

# SUPREME COURT OF THE UNITED STATES

---

No. 13–9972

---

## DENNYS RODRIGUEZ, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

[April 21, 2015]

JUSTICE THOMAS, with whom JUSTICE ALITO joins, and with whom JUSTICE KENNEDY joins as to all but Part III, dissenting.

Ten years ago, we explained that "conducting a dog sniff [does] not change the character of a traffic stop that is lawful at its inception and otherwise executed in a reasonable manner." *Illinois* v. *Caballes*, 543 U. S. 405, 408 (2005). The only question here is whether an officer executed a stop in a reasonable manner when he waited to conduct a dog sniff until after he had given the driver a written warning and a backup unit had arrived, bringing the overall duration of the stop to 29 minutes. Because the stop was reasonably executed, no Fourth Amendment violation occurred. The Court's holding to the contrary cannot be reconciled with our decision in *Caballes* or a number of common police practices. It was also unnecessary, as the officer possessed reasonable suspicion to continue to hold the driver to conduct the dog sniff. I respectfully dissent.

I

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U. S. Const., Amdt. 4. As the text indicates, and as we

2                    RODRIGUEZ *v.* UNITED STATES

have repeatedly confirmed, "the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Brigham City* v. *Stuart*, 547 U. S. 398, 403 (2006). We have defined reasonableness "in objective terms by examining the totality of the circumstances," *Ohio* v. *Robinette*, 519 U. S. 33, 39 (1996), and by considering "the traditional protections against unreasonable searches and seizures afforded by the common law at the time of the framing," *Atwater* v. *Lago Vista*, 532 U. S. 318, 326 (2001) (internal quotation marks omitted). When traditional protections have not provided a definitive answer, our precedents have "analyzed a search or seizure in light of traditional standards of reasonableness by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Virginia* v. *Moore*, 553 U. S. 164, 171 (2008) (internal quotation marks omitted).

Although a traffic stop "constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]," such a seizure is constitutionally "reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren* v. *United States*, 517 U. S. 806, 809–810 (1996). But "a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Caballes*, *supra,* at 407.

Because Rodriguez does not dispute that Officer Struble had probable cause to stop him, the only question is whether the stop was otherwise executed in a reasonable manner. See Brief for Appellant in No. 13–1176 (CA8), p. 4, n. 2. I easily conclude that it was. Approximately 29 minutes passed from the time Officer Struble stopped Rodriguez until his narcotics-detection dog alerted to the presence of drugs. That amount of time is hardly out of the ordinary for a traffic stop by a single officer of a vehi-

cle containing multiple occupants even when no dog sniff is involved. See, *e.g., United States* v. *Ellis*, 497 F. 3d 606 (CA6 2007) (22 minutes); *United States* v. *Barragan*, 379 F. 3d 524 (CA8 2004) (approximately 30 minutes). During that time, Officer Struble conducted the ordinary activities of a traffic stop—he approached the vehicle, questioned Rodriguez about the observed violation, asked Pollman about their travel plans, ran serial warrant checks on Rodriguez and Pollman, and issued a written warning to Rodriguez. And when he decided to conduct a dog sniff, he took the precaution of calling for backup out of concern for his safety. See 741 F. 3d 905, 907 (CA8 2014); see also *Pennsylvania* v. *Mimms*, 434 U. S. 106, 110 (1977) (*per curiam*) (officer safety is a "legitimate and weighty" concern relevant to reasonableness).

As *Caballes* makes clear, the fact that Officer Struble waited until after he gave Rodriguez the warning to conduct the dog sniff does not alter this analysis. Because "the use of a well-trained narcotics-detection dog . . . generally does not implicate legitimate privacy interests," 543 U. S., at 409, "conducting a dog sniff would not change the character of a traffic stop that is lawful at its inception and otherwise executed in a reasonable manner," *id.,* at 408. The stop here was "lawful at its inception and otherwise executed in a reasonable manner." *Ibid.* As in *Caballes*, "conducting a dog sniff [did] not change the character of [the] traffic stop," *ibid.*, and thus no Fourth Amendment violation occurred.

## II

Rather than adhere to the reasonableness requirement that we have repeatedly characterized as the "touchstone of the Fourth Amendment," *Brigham City*, *supra*, at 403, the majority constructed a test of its own that is inconsistent with our precedents.

4                  RODRIGUEZ *v.* UNITED STATES

### A

The majority's rule requires a traffic stop to "en[d] when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Ante*, at 5. "If an officer can complete traffic-based inquiries expeditiously, then that is the amount of time reasonably required to complete the stop's mission" and he may hold the individual no longer. *Ante*, at 8 (internal quotation marks and alterations omitted). The majority's rule thus imposes a one-way ratchet for constitutional protection linked to the characteristics of the individual officer conducting the stop: If a driver is stopped by a particularly efficient officer, then he will be entitled to be released from the traffic stop after a shorter period of time than a driver stopped by a less efficient officer. Similarly, if a driver is stopped by an officer with access to technology that can shorten a records check, then he will be entitled to be released from the stop after a shorter period of time than an individual stopped by an officer without access to such technology.

I "cannot accept that the search and seizure protections of the Fourth Amendment are so variable and can be made to turn upon such trivialities." *Whren*, 517 U. S.*,* at 815 (citations omitted). We have repeatedly explained that the reasonableness inquiry must not hinge on the characteristics of the individual officer conducting the seizure. We have held, for example, that an officer's state of mind "does not invalidate [an] action taken as long as the circumstances, viewed objectively, justify that action." *Id.*, at 813 (internal quotation marks omitted). We have spurned theories that would make the Fourth Amendment "change with local law enforcement practices." *Moore*, *supra*, at 172. And we have rejected a rule that would require the offense establishing probable cause to be "closely related to" the offense identified by the arresting officer, as such a rule would make "the constitutionality of an arrest . . . vary from place to place and from time to time, depending

THOMAS, J., dissenting

on whether the arresting officer states the reason for the detention and, if so, whether he correctly identifies a general class of offense for which probable cause exists." *Devenpeck* v. *Alford*, 543 U. S. 146, 154 (2004) (internal quotation marks and citation omitted). In *Devenpeck*, a unanimous Court explained: "An arrest made by a knowledgeable, veteran officer would be valid, whereas an arrest made by a rookie *in precisely the same circumstances* would not. We see no reason to ascribe to the Fourth Amendment such arbitrarily variable protection." *Ibid.*

The majority's logic would produce similarly arbitrary results. Under its reasoning, a traffic stop made by a rookie could be executed in a reasonable manner, whereas the same traffic stop made by a knowledgeable, veteran officer *in precisely the same circumstances* might not, if in fact his knowledge and experience made him capable of completing the stop faster. We have long rejected interpretations of the Fourth Amendment that would produce such haphazard results, and I see no reason to depart from our consistent practice today.

B

As if that were not enough, the majority also limits the duration of the stop to the time it takes the officer to complete a narrow category of "traffic-based inquiries." *Ante,* at 8. According to the majority, these inquiries include those that "serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." *Ante,* at 6. Inquiries directed to "detecting evidence of ordinary criminal wrongdoing" are not traffic-related inquiries and thus cannot count toward the overall duration of the stop. *Ibid.* (internal quotation marks and alteration omitted).

The combination of that definition of traffic-related inquiries with the majority's officer-specific durational limit produces a result demonstrably at odds with our

6          RODRIGUEZ *v.* UNITED STATES

decision in *Caballes*. *Caballes* expressly anticipated that a traffic stop could be *reasonably* prolonged for officers to engage in a dog sniff. We explained that no Fourth Amendment violation had occurred in *Caballes*, where the "duration of the stop . . . was entirely justified by the traffic offense and the ordinary inquiries incident to such a stop," but suggested a different result might attend a case "involving a dog sniff that occurred during an *unreasonably* prolonged traffic stop." 543 U. S.*,* at 407–408 (emphasis added). The dividing line was whether the overall duration of the stop exceeded "the time reasonably required to complete th[e] mission," *id.,* at 407, not, as the majority suggests, whether the duration of the stop "in fact" exceeded the time necessary to complete the traffic-related inquiries, *ante,* at 8.

The majority's approach draws an artificial line between dog sniffs and other common police practices. The lower courts have routinely confirmed that warrant checks are a constitutionally permissible part of a traffic stop, see, *e.g., United States* v. *Simmons*, 172 F. 3d 775, 778 (CA11 1999); *United States* v. *Mendez*, 118 F. 3d 1426, 1429 (CA10 1997); *United States* v. *Shabazz*, 993 F. 2d 431, 437 (CA5 1993), and the majority confirms that it finds no fault in these measures, *ante,* at 6. Yet its reasoning suggests the opposite. Such warrant checks look more like they are directed to "detecting evidence of ordinary criminal wrongdoing" than to "ensuring that vehicles on the road are operated safely and responsibly." *Ante,* at 6 (internal quotation marks and alteration omitted). Perhaps one could argue that the existence of an outstanding warrant might make a driver less likely to operate his vehicle safely and responsibly on the road, but the same could be said about a driver in possession of contraband. A driver confronted by the police in either case might try to flee or become violent toward the officer. But under the majority's analysis, a dog sniff, which is directed at uncov-

ering that problem, is not treated as a traffic-based inquiry. Warrant checks, arguably, should fare no better. The majority suggests that a warrant check is an ordinary inquiry incident to a traffic stop because it can be used "'to determine whether the apparent traffic violator is wanted for one or more previous traffic offenses.'" *Ante,* at 6 (quoting 4 W. LaFave, Search and Seizure §9.3(c), p. 516 (5th ed. 2012)). But as the very treatise on which the majority relies notes, such checks are a "manifest[ation of] the 'war on drugs' motivation so often underlying [routine traffic] stops," and thus are very much like the dog sniff in this case. *Id.*, §9.3(c), at 507–508.

Investigative questioning rests on the same basis as the dog sniff. "Asking questions is an essential part of police investigations." *Hiibel* v. *Sixth Judicial Dist. Court of Nev., Humboldt Cty.*, 542 U. S. 177, 185 (2004). And the lower courts have routinely upheld such questioning during routine traffic stops. See, *e.g., United States* v. *Rivera*, 570 F. 3d 1009, 1013 (CA8 2009); *United States* v. *Childs*, 277 F. 3d 947, 953–954 (CA7 2002). The majority's reasoning appears to allow officers to engage in *some* questioning aimed at detecting evidence of ordinary criminal wrongdoing. *Ante,* at 5. But it is hard to see how such inquiries fall within the "seizure's 'mission' [of] address[ing] the traffic violation that warranted the stop," or "attend[ing] to related safety concerns." *Ibid.* Its reasoning appears to come down to the principle that dogs are different.

C

On a more fundamental level, the majority's inquiry elides the distinction between traffic stops based on probable cause and those based on reasonable suspicion. Probable cause is *the* "traditional justification" for the seizure of a person. *Whren*, 517 U. S*.,* at 817 (emphasis deleted); see also *Dunaway* v. *New York*, 442 U. S. 200,

207–208 (1979). This Court created an exception to that rule in *Terry* v. *Ohio*, 392 U. S. 1 (1968), permitting "police officers who suspect criminal activity to make limited intrusions on an individual's personal security based on less than probable cause," *Michigan* v. *Summers*, 452 U. S. 692, 698 (1981). Reasonable suspicion is the justification for such seizures. *Prado Navarette* v. *California*, 572 U. S. ___, ___ (2014) (slip op., at 3).

Traffic stops can be initiated based on probable cause or reasonable suspicion. Although the Court has commented that a routine traffic stop is "more analogous to a so-called '*Terry* stop' than to a formal arrest," it has rejected the notion "that a traffic stop supported by probable cause may not exceed the bounds set by the Fourth Amendment on the scope of a *Terry* stop." *Berkemer* v. *McCarty*, 468 U. S. 420, 439, and n. 29 (1984) (citation omitted).

Although all traffic stops must be executed reasonably, our precedents make clear that traffic stops justified by reasonable suspicion are subject to additional limitations that those justified by probable cause are not. A traffic stop based on reasonable suspicion, like all *Terry* stops, must be "justified at its inception" and "reasonably related in scope to the circumstances which justified the interference in the first place." *Hiibel,* 542 U. S.*,* at 185 (internal quotation marks omitted). It also "cannot continue for an excessive period of time or resemble a traditional arrest." *Id.,* at 185–186 (citation omitted). By contrast, a stop based on probable cause affords an officer considerably more leeway. In such seizures, an officer may engage in a warrantless arrest of the driver, *Atwater,* 532 U. S.*,* at 354, a warrantless search incident to arrest of the driver, *Riley* v. *California*, 573 U. S. ___, ___ (2014) (slip op., at 5), and a warrantless search incident to arrest of the vehicle if it is reasonable to believe evidence relevant to the crime of arrest might be found there, *Arizona* v. *Gant*, 556 U. S. 332, 335 (2009).

The majority casually tosses this distinction aside. It asserts that the traffic stop in this case, which was undisputedly initiated on the basis of probable cause, can last no longer than is in fact necessary to effectuate the mission of the stop. *Ante,* at 8. And, it assumes that the mission of the stop was merely to write a traffic ticket, rather than to consider making a custodial arrest. *Ante,* at 5. In support of that durational requirement, it relies primarily on cases involving *Terry* stops. See *ante,* at 5–7 (citing *Arizona* v. *Johnson*, 555 U. S. 323 (2009) (analyzing "stop and frisk" of *passenger* in a vehicle temporarily seized for a traffic violation); *United States* v. *Sharpe*, 470 U. S. 675 (1985) (analyzing seizure of individuals based on suspicion of marijuana trafficking); *Florida* v. *Royer*, 460 U. S. 491 (1983) (plurality opinion) (analyzing seizure of man walking through airport on suspicion of narcotics activity)).

The *only* case involving a traffic stop based on probable cause that the majority cites for its rule is *Caballes*. But, that decision provides no support for today's restructuring of our Fourth Amendment jurisprudence. In *Caballes*, the Court made clear that, in the context of a traffic stop supported by probable cause, "a dog sniff would not change the character of a traffic stop that is lawful at its inception and otherwise executed in a reasonable manner." 543 U. S., at 408. To be sure, *the dissent* in *Caballes* would have "appl[ied] *Terry*'s reasonable-relation test . . . to determine whether the canine sniff impermissibly expanded the scope of the initially valid seizure of Caballes." *Id.,* at 420 (GINSBURG, J., dissenting). But even it conceded that the *Caballes* majority had "implicitly [rejected] the application of *Terry* to a traffic stop converted, by calling in a dog, to a drug search." *Id.,* at 421.

By strictly limiting the tasks that define the durational scope of the traffic stop, the majority accomplishes today what the *Caballes* dissent could not: strictly limiting the

10        RODRIGUEZ *v.* UNITED STATES

scope of an officer's activities during a traffic stop justified by probable cause. In doing so, it renders the difference between probable cause and reasonable suspicion virtually meaningless in this context. That shift is supported neither by the Fourth Amendment nor by our precedents interpreting it. And, it results in a constitutional framework that lacks predictability. Had Officer Struble arrested, handcuffed, and taken Rodriguez to the police station for his traffic violation, he would have complied with the Fourth Amendment. See *Atwater, supra,* at 354–355. But because he made Rodriguez wait for seven or eight extra minutes until a dog arrived, he evidently committed a constitutional violation. Such a view of the Fourth Amendment makes little sense.

## III

Today's revision of our Fourth Amendment jurisprudence was also entirely unnecessary. Rodriguez suffered no Fourth Amendment violation here for an entirely independent reason: Officer Struble had reasonable suspicion to continue to hold him for investigative purposes. Our precedents make clear that the Fourth Amendment permits an officer to conduct an investigative traffic stop when that officer has "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Prado Navarette,* 572 U. S., at ___ (slip op., at 3) (internal quotation marks omitted). Reasonable suspicion is determined by looking at "the whole picture," *ibid.*, taking into account "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act," *Ornelas* v. *United States*, 517 U. S. 690, 695 (1996) (internal quotation marks omitted).

Officer Struble testified that he first became suspicious that Rodriguez was engaged in criminal activity for a number of reasons. When he approached the vehicle, he

smelled an "overwhelming odor of air freshener coming from the vehicle," which is, in his experience, "a common attempt to conceal an odor that [people] don't want . . . to be smelled by the police." App. 20–21. He also observed, upon approaching the front window on the passenger side of the vehicle, that Rodriguez's passenger, Scott Pollman, appeared nervous. Pollman pulled his hat down low, puffed nervously on a cigarette, and refused to make eye contact with him. The officer thought he was "more nervous than your typical passenger" who "do[esn't] have anything to worry about because [t]hey didn't commit a [traffic] violation." *Id.*, at 34.

Officer Struble's interactions with the vehicle's occupants only increased his suspicions. When he asked Rodriguez why he had driven onto the shoulder, Rodriguez claimed that he swerved to avoid a pothole. But that story could not be squared with Officer Struble's observation of the vehicle slowly driving off the road before being jerked back onto it. And when Officer Struble asked Pollman where they were coming from and where they were going, Pollman told him they were traveling from Omaha, Nebraska, back to Norfolk, Nebraska, after looking at a vehicle they were considering purchasing. Pollman told the officer that he had neither seen pictures of the vehicle nor confirmed title before the trip. As Officer Struble explained, it "seemed suspicious" to him "to drive . . . approximately two hours . . . late at night to see a vehicle sight unseen to possibly buy it," *id.,* at 26, and to go from Norfolk to Omaha to look at it because "[u]sually people leave Omaha to go get vehicles, not the other way around" due to higher Omaha taxes, *id.,* at 65.

These facts, taken together, easily meet our standard for reasonable suspicion. "[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion," *Illinois* v. *Wardlow*, 528 U. S. 119, 124 (2000), and both vehicle occupants were engaged in such conduct. The

12          RODRIGUEZ *v.* UNITED STATES

officer also recognized heavy use of air freshener, which, in his experience, indicated the presence of contraband in the vehicle. "[C]ommonsense judgments and inferences about human behavior" further support the officer's conclusion that Pollman's story about their trip was likely a cover story for illegal activity. *Id.,* at 125. Taking into account all the relevant facts, Officer Struble possessed reasonable suspicion of criminal activity to conduct the dog sniff.

Rodriguez contends that reasonable suspicion cannot exist because each of the actions giving rise to the officer's suspicions could be entirely innocent, but our cases easily dispose of that argument. Acts that, by themselves, might be innocent can, when taken together, give rise to reasonable suspicion. *United States* v. *Arvizu*, 534 U. S. 266, 274–275 (2002). *Terry* is a classic example, as it involved two individuals repeatedly walking back and forth, looking into a store window, and conferring with one another as well as with a third man. 392 U. S., at 6. The Court reasoned that this "series of acts, each of them perhaps innocent in itself, . . . together warranted further investigation," *id.,* at 22, and it has reiterated that analysis in a number of cases, see, *e.g., Arvizu, supra,* at 277; *United States* v. *Sokolow*, 490 U. S. 1, 9–10 (1989). This one is no different.

*     *     *

I would conclude that the police did not violate the Fourth Amendment here. Officer Struble possessed probable cause to stop Rodriguez for driving on the shoulder, and he executed the subsequent stop in a reasonable manner. Our decision in *Caballes* requires no more. The majority's holding to the contrary is irreconcilable with *Caballes* and a number of other routine police practices, distorts the distinction between traffic stops justified by probable cause and those justified by reasonable suspicion, and abandons reasonableness as the touchstone of the Fourth Amendment. I respectfully dissent.

# SUPREME COURT OF THE UNITED STATES

———————

No. 13–9972

———————

## DENNYS RODRIGUEZ, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

[April 21, 2015]

JUSTICE ALITO, dissenting.

This is an unnecessary,[1] impractical, and arbitrary decision. It addresses a purely hypothetical question: whether the traffic stop in this case *would be* unreasonable if the police officer, prior to leading a drug-sniffing dog around the exterior of petitioner's car, did not already have reasonable suspicion that the car contained drugs. In fact, however, the police officer *did have* reasonable suspicion, and, as a result, the officer was justified in detaining the occupants for the short period of time (seven or eight minutes) that is at issue.

The relevant facts are not in dispute. Officer Struble, who made the stop, was the only witness at the suppression hearing, and his testimony about what happened was not challenged. Defense counsel argued that the facts recounted by Officer Struble were insufficient to establish reasonable suspicion, but defense counsel did not dispute those facts or attack the officer's credibility. Similarly, the Magistrate Judge who conducted the hearing did not question the officer's credibility. And as JUSTICE THOMAS's opinion shows, the facts recounted by Officer Struble "easily meet our standard for reasonable suspicion." *Ante*, at 11 (dissenting opinion); see also, *e.g.*, *United*

_____

[1] See Brief in Opposition 11–14.

*States* v. *Carpenter*, 462 F. 3d 981, 986–987 (CA8 2006) (finding reasonable suspicion for a dog sniff based on implausible travel plans and nervous conduct); *United States* v. *Ludwig*, 641 F. 3d 1243, 1248–1250 (CA10 2011) (finding reasonable suspicion for a dog sniff where, among other things, the officer smelled "strong masking odors," the defendant's "account of his travel was suspect," and the defendant "was exceptionally nervous throughout his encounter").

Not only does the Court reach out to decide a question not really presented by the facts in this case, but the Court's answer to that question is arbitrary. The Court refuses to address the real Fourth Amendment question: whether the stop was unreasonably prolonged. Instead, the Court latches onto the fact that Officer Struble delivered the warning prior to the dog sniff and proclaims that the authority to detain based on a traffic stop ends when a citation or warning is handed over to the driver. The Court thus holds that the Fourth Amendment was violated, not because of the length of the stop, but simply because of the sequence in which Officer Struble chose to perform his tasks.

This holding is not only arbitrary; it is perverse since Officer Struble chose that sequence for the purpose of protecting his own safety and possibly the safety of others. See App. 71–72. Without prolonging the stop, Officer Struble could have conducted the dog sniff while one of the tasks that the Court regards as properly part of the traffic stop was still in progress, but that sequence would have entailed unnecessary risk. At approximately 12:19 a.m., after collecting Pollman's driver's license, Officer Struble did two things. He called in the information needed to do a records check on Pollman (a step that the Court recognizes was properly part of the traffic stop), and he requested that another officer report to the scene. Officer Struble had decided to perform a dog sniff but did not

want to do that without another officer present. When occupants of a vehicle who know that their vehicle contains a large amount of illegal drugs see that a drug-sniffing dog has alerted for the presence of drugs, they will almost certainly realize that the police will then proceed to search the vehicle, discover the drugs, and make arrests. Thus, it is reasonable for an officer to believe that an alert will increase the risk that the occupants of the vehicle will attempt to flee or perhaps even attack the officer. See, *e.g., United States* v. *Dawdy*, 46 F. 3d 1427, 1429 (CA8 1995) (recounting scuffle between officer and defendant after drugs were discovered).

In this case, Officer Struble was concerned that he was outnumbered at the scene, and he therefore called for backup and waited for the arrival of another officer before conducting the sniff. As a result, the sniff was not completed until seven or eight minutes after he delivered the warning. But Officer Struble could have proceeded with the dog sniff while he was waiting for the results of the records check on Pollman and before the arrival of the second officer. The drug-sniffing dog was present in Officer Struble's car. If he had chosen that riskier sequence of events, the dog sniff would have been completed before the point in time when, according to the Court's analysis, the authority to detain for the traffic stop ended. Thus, an action that would have been lawful had the officer made the *unreasonable* decision to risk his life became unlawful when the officer made the *reasonable* decision to wait a few minutes for backup. Officer Struble's error— apparently—was following prudent procedures motivated by legitimate safety concerns. The Court's holding therefore makes no practical sense. And nothing in the Fourth Amendment, which speaks of *reasonableness*, compels this arbitrary line.

The rule that the Court adopts will do little good going

4                 RODRIGUEZ *v.* UNITED STATES

ALITO, J., dissenting

forward.[2]  It is unlikely to have any appreciable effect on
the length of future traffic stops.  Most officers will learn
the prescribed sequence of events even if they cannot
fathom the reason for that requirement.  (I would love to
be the proverbial fly on the wall when police instructors
teach this rule to officers who make traffic stops.)

For these reasons and those set out in JUSTICE
THOMAS's opinion, I respectfully dissent.

––––––––––

[2] It is important to note that the Court's decision does not affect pro-
cedures routinely carried out during traffic stops, including "checking
the driver's license, determining whether there are outstanding war-
rants against the driver, and inspecting the automobile's registration
and proof of insurance." *Ante,* at 6.  And the Court reaffirms that police
"may conduct certain unrelated checks during an otherwise lawful
traffic stop." *Ibid.*  Thus, it remains true that police may ask questions
aimed at uncovering other criminal conduct and may order occupants
out of their car during a valid stop.  See *Arizona* v. *Johnson,* 555 U. S.
323, 333 (2009); *Maryland* v. *Wilson,* 519 U. S. 408, 414–415 (1997);
*Pennsylvania* v. *Mimms,* 434 U. S. 106, 111 (1977) (*per curiam*).